NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0830-24

HOLTEC INTERNATIONAL,

    Plaintiff-Appellant,

v.

JAVERBAUM WURGAFT
HICKS KAHN WIKSTROM
& SININS, PC,

    Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**July 13, 2026**

**APPELLATE DIVISION**

Argued March 5, 2026 – Decided July 13, 2026

Before Judges Sumners, Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2069-24.

Scott H. Casher argued the cause for appellant (White and Williams LLP, attorneys; Siobhan K. Cole, Scott H. Casher, and Farzana Yeager, on the briefs).

Bruce S. Rosen argued the cause for respondent (Pashman Stein Walder Hayden, PC, attorneys; Bruce S. Rosen, on the brief).

The opinion of the court was delivered by

AUGOSTINI, J.A.D.

In this appeal, we address whether N.J.S.A. 2A:53A-50(c)(3), the commercial speech exemption of the Uniform Public Expression Protection Act (UPEPA), N.J.S.A. 2A:53A-49 to -61, applies to a law firm's posting of an article on its website regarding a wrongful termination complaint it filed on behalf of a client.

The motion judge found that the posting by defendant law firm Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C. (Javerbaum) about the case involved a matter of public concern and thus UPEPA applied. The judge further found that UPEPA's commercial speech exemption did not apply and that the complaint filed by plaintiff Holtec International (Holtec) failed to establish a prima facie case for defamation.

Holtec appeals the October 24, 2024 order dismissing its defamation complaint, contending the judge erred by: (1) applying UPEPA to Javerbaum's allegedly false and defamatory commercial speech; (2) finding Javerbaum's speech pertained to a matter of public concern; and (3) concluding that Holtec had not pled a legally viable defamation claim.

We hold that UPEPA applies to Javerbaum's communication as a matter of public concern and that the commercial speech exemption does not apply to this informational article posted on the firm's website. Moreover, in applying UPEPA to the facts of this case, the judge correctly determined that Holtec's

pleadings did not establish a prima facie case of defamation and dismissed Holtec's complaint with prejudice.

I.

We summarize the facts and procedural history from the summary hearing record. In August 2022, Holtec fired its former Chief Financial Officer (CFO), Kevin O'Rourke (O'Rourke). Following his termination, O'Rourke retained Javerbaum to sue Holtec for his alleged wrongful termination. On June 1, 2023, Javerbaum filed a lawsuit on O'Rourke's behalf against Holtec. The complaint, alleging a claim under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, asserted that Holtec fired O'Rourke "after he resisted submitting false financial statements to a major investor, an issue involving hundreds of millions of dollars."

O'Rourke alleged that Holtec and its Chief Executive Officer, Krishna Singh, were composing an "[i]nvestment [p]rospectus," which included financial projections for the company, in preparation for a meeting with a potential investor. O'Rourke expressed concern about completing the financial projections for the prospectus accurately within the timeframe Singh gave him. He alleged that the document included "false and misleading statements, and legally the document could not contain 'make believe' or unsupported financial projections."

3

A-0830-24

On July 7, 2023, the Asbury Park Press wrote a story with the headline "Ex-Holtec CFO accuses company of 'make believe' financial statements in whistleblower suit." Approximately two weeks later, Javerbaum posted a news article on its law firm website about the O'Rourke complaint entitled, "Javerbaum Wurgaft Files Whistleblower Lawsuit Against Holtec International on Behalf of Former CFO" and included a link to the Asbury Park Press article. Javerbaum's article repeated the statement: "[] O'Rourke claims that Holtec terminated his employment after he resisted submitting false financial statements to a major investor, an issue involving hundreds of millions of dollars." On the same day, the article was posted on Javerbaum's social media pages.

Holtec's attorneys reached out to the Asbury Park Press regarding the article and requested a correction be made to the story, contending that the documents O'Rourke referenced in his complaint were not "financial statements" but rather were "misleading projections." The newspaper consented to the request and clarified the statement.

Unlike the Asbury Park Press, Javerbaum did not modify or retract its article. In response to the posting, Holtec filed a one-count defamation complaint against Javerbaum. Javerbaum, in turn, filed an order to show cause pursuant to UPEPA, seeking dismissal of Holtec's defamation complaint,

A-0830-24

contending its speech related to O'Rouke's CEPA complaint, was a matter of public concern, and was protected speech.

The motion judge agreed with Javerbaum, concluding that its speech was protected under UPEPA because: (1) the speech involved a matter of public importance; (2) UPEPA's commercial speech exemption did not apply because the speech was not commercial, relating to "goods and services;" and (3) defendant was entitled to dismissal of Holtec's complaint as a matter of law because Javerbaum's speech was not false.

The judge explained that the phrase "financial statement[s]" was generic terminology and that the average person would understand that the term is "being used in a far broader context . . . than a [] very narrow context" as plaintiff argued. The judge concluded that Javerbaum's speech was not commercial in nature and that UPEPA applied. The judge acknowledged the common practice of law firms creating postings on their websites and social media accounts to highlight cases their firms are handling.

On appeal, Holtec argues the motion judge erred in finding that UPEPA applied to Javerbaum's speech for the following reasons: (1) UPEPA does not apply to Javerbaum's commercial speech; (2) Javerbaum's speech is not a matter of public concern; and (3) Holtec pled a viable claim for defamation.

A-0830-24

II.

We begin with the issue of whether the judge correctly determined that UPEPA applied to Javerbaum's postings.  "In 2023, our Legislature passed UPEPA, commonly referred to as anti-SLAPP (strategic lawsuits against public participation),[1] to 'protect residents against frivolous, ill-intentioned lawsuits and insulate them from the financial hardships these cases can produce.'" Lento L. Grp., PC v. Hendrickson, ___ N.J. Super. ___ (App. Div. 2026) (slip op. at 7) (quoting Satz v. Starr, 482 N.J. Super. 55, 65 (App. Div. 2025) (quoting Press Release, Off. of the Governor, Governor Murphy Signs Bipartisan Bill Protecting Against Lawsuits Designed to Suppress Free Speech, at 1 (Sept. 7, 2023))).[2]  UPEPA is to be construed "broadly . . . to protect the exercise of the right of freedom of speech and of the press, the right to assembly and petition, and the right of association, guaranteed by the United States Constitution or the New Jersey Constitution."  N.J.S.A. 2A:53A-59.

---

[1]  SLAPP refers to Strategic Lawsuits Against Public Participation, which can constrain freedoms afforded by the Constitution.  See Baglini v. Lauletta, 338 N.J. Super. 282, 302 (App. Div. 2001).  UPEPA is similar to SLAPP-back or anti-SLAPP lawsuits, which allow an individual to "demonstrate that as a result of the SLAPP suit his or her right to free speech or to petition was actually infringed."  LoBiondo v. Schwartz, 199 N.J. 62, 72 (2009).

[2]  https://dspace.njstatelib.org/items/bad7b805-be6e-4556-8f62-8aa2e7b9bf45.

A-0830-24

To qualify for protection under UPEPA, "a cause of action asserted in a civil case" must fall within one of the following categories "based on the person's:

> (1) communication in a legislative, executive, judicial, administrative, or other governmental proceeding;
>
> (2) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or
>
> (3) exercise of the right of freedom of speech or of the press, the right to assembly or petition, or the right of association, guaranteed by the United States Constitution or the New Jersey Constitution, on a matter of public concern."
>
> [N.J.S.A. 2A:53A-50(b).]

If a communication qualifies for protection under UPEPA, it may be excluded from that protection under N.J.S.A. 2A:53A-50(c) if it is:

> (1) against a governmental unit or an employee or agent of a governmental unit acting or purporting to act in an official capacity;
>
> (2) by a governmental unit or an employee or agent of a governmental unit acting in an official capacity to enforce a law to protect against an imminent threat to public health or safety; or
>
> (3) against a person primarily engaged in the business of selling or leasing goods or services if the cause of action arises out of a communication related to the person's sale or lease of the goods or services.

UPEPA provides a party with an expedited hearing and dismissal process through the filing of an order to show cause.

> To determine whether the lawsuit should proceed, "the court may consider the pleadings, the [OTSC] application and supporting certifications, briefs, any reply or response to the [OTSC], and any evidence that could be considered in ruling on a motion for summary judgment" under Rule 4:46-2, . . . and may also allow limited discovery in certain circumstances.
>
> [Lento, ___ N.J. Super. at ___ (slip op. at 9) (first citing Wunsch v. Cte Republicans for Englewood Cliffs, 483 N.J. Super. 231, 246 (App. Div. 2026) and then citing N.J.S.A. 2A:53A-52(d), -54).]

Under UPEPA, "a complaint may be dismissed through a summary judgment motion or a motion to dismiss standard." Id. at ___ (slip op. at 10).

At the hearing on an order to show cause:

> a . . . the court shall dismiss with prejudice a cause of action, or part of a cause of action, if:
>
> (1) the moving party established under subsection b. of section 2 of L. 2023, c. 155 (C.2A:53A-50) that this act applies;
>
> (2) the responding party fails to establish under subsection c. of section 2 of L. 2023, c. 155 (C.2A:53A-50) that this act does not apply; and
>
> (3) either:
>
> (a) the responding party fails to establish a prima facie case as to each essential element of any cause of action in the complaint; or

(b) the moving party establishes that:

(i) the responding party failed to state a cause of action upon which relief can be granted; or

(ii) there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

[N.J.S.A. 2A:53A-55.]

A court may award reasonable attorney's fees under N.J.S.A. 2A:53A-55(b) and 2A:53A-58.

"The Legislature directed that UPEPA be construed 'broadly . . . to protect the exercise of the right of freedom of speech and of the press, the right to assembly and petition, and the right of association, guaranteed by the United States or the New Jersey Constitution.'" Lento, ___ N.J. Super. at ___ (slip op. at 8) (quoting N.J.S.A. 2A:53A-59). Relevantly, speech regarding a matter of public concern is protected under UPEPA.

Interpreting UPEPA broadly, the motion judge agreed with Javerbaum that the articles involved a matter of public importance and concern because Holtec is a major company involved in the "significant" "business . . . of nuclear reactors." We agree.

UPEPA does not define "a matter of public concern." Nor has our caselaw directly addressed this issue in the context of a UPEPA matter.

A-0830-24

However, in the defamation context, matters of "public concern" include "'subjects related to health and safety, highly regulated industries, and consumer fraud.'" Durando v. Nutley Sun, 209 N.J. 235, 250 (2012) (quoting Senna v. Florimont, 196 N.J. 469, 495 (2008)).  Moreover, our Supreme Court in Senna v. Florimont, noted that "business activities that affect health and safety and industries that are highly regulated by the government 'intrinsically implicate[] important public interests.'"  196 N.J. at 488 (quoting Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 410-12 (1995)).  "[T]he public [also] has a compelling 'interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern.'"  Ibid.

To determine whether a communication involves a matter of public concern, New Jersey has adopted a "useful formula" enunciated in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.:  a court must review its "content, form, and context . . . as revealed by the whole record."  Senna, 196 N.J. at 492 (alteration in original) (quoting Dun & Bradstreet, 472 U.S. 749, 761 (1985) (citations omitted)).  Additionally, a court must consider the identity of the speaker and the targeted audience.  Id. at 493.

Holtec contends that the content of the postings was not about a matter of public concern or anything to do with its nuclear reactor business.  Rather,

10

according to Holtec, it was "an internet campaign designed to generate notoriety and business for Javerbaum by falsely sensationalizing the nature and significance of a case it brought against a large company with a recognizable name."

The context of the communication involved Javerbaum's lawsuit on behalf of O'Rourke, contending "that Holtec terminated his employment after he resisted submitting false financial statements to a major investor, an issue involving hundreds of millions of dollars." As the motion judge pointed out, Holtec is a major company in the business of nuclear reactors. The company is involved in a highly regulated industry. Indeed, Holtec contends that the article jeopardized its access to grants and federal financial programs, as well as its contracts with foreign governments.

The public has an interest in its nuclear energy projects. Based on the content and context of the articles as revealed by the entire record, Holtec's financial prospectus created to entice investors which was at the heart of its dispute with O'Rourke, has the potential to affect its relationship with government agencies and invokes public concern. Thus, we discern no error in the judge's finding that the postings involve a matter of public concern.

III.

11

A-0830-24

Having determined that UPEPA applies to Javerbaum's postings, we next address whether the communication is excluded from protection under UPEPA's commercial speech exemption. As we previously noted, if a communication qualifies for protection under UPEPA, it may be excluded from that protection "if the cause of action arises out of a communication related to the person's sale or lease of the[ir] goods or services." N.J.S.A. 2A:53A-50(c)(3).

Holtec contends that UPEPA does not protect defamatory commercial speech, and the judge erred by not applying the commercial speech exemption to Javerbaum's postings. Holtec asserts that the postings arose out of Javerbaum's services as a law firm and were used to advertise its legal services. Holtec further asserts that Javerbaum's website contained an advertisement disclosure, thereby making the article posted in their news section regarding O'Rourke's case an attempt to attract prospective clients.

We begin our analysis guided by well-established principles of statutory construction. "The overriding goal of all statutory interpretation 'is to determine as best we can the intent of the Legislature, and to give effect to that intent.'" State v. S.B., 230 N.J. 62, 67 (2017) (quoting State v. Robinson, 217 N.J. 594, 604 (2014) (citations omitted)). In reviewing the language of a statute, the court "ascribe[s] to the statutory words their ordinary meaning and

significance, . . . and read[s] them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005).

In addition to the statutory principle "that effectuating the legislative plan [is] of paramount concern[,]" we also rely on the principle that "statutory exemptions must be strictly but reasonably construed." Matter of Proposed Const. of Compressor Station (CS327), 258 N.J. 312, 320 (2024) (quoting Matter of Proposed Constr. of Compressor Station, 476 N.J. Super. 556, 569 (App. Div. 2023) (citations omitted) (internal quotation omitted)); see also Young v. Schering Corp., 141 N.J. 16, 25-26 (1996).

A cause of action under UPEPA is not viable if it is based on a person's "communication in a . . . judicial proceeding." N.J.S.A. 2A:53A-50(b). The judge did not address whether Javerbaum's postings constituted a "communication in a judicial proceeding." Because we discern no error in the court's analysis and application of UPEPA, we need not reach this issue.

Our case law has not yet addressed the question of whether speech by lawyers or law firms outside of the confines of a judicial proceeding regarding a pending legal matter constitutes commercial speech and is exempted from UPEPA's protections. Other states with comparable anti-SLAPP laws have addressed the commercial speech exemption. Although those states have not

yet interpreted the exemption in the same context, case law arising from California's and Texas' anti-SLAPP statutes offer guidance.

Texas enacted the Texas Citizens Participation Act (TCPA) in 2011, an anti-SLAPP statute designed "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002. Although not UPEPA, the TCPA's aims are similar and also does not apply to actions based on commercial speech. Castleman v. Internet Money Ltd., 546 S.W.3d 684, 685 (Tex. 2018).

The Supreme Court of Texas, in Castleman v. Internet Money Ltd., addressed whether the TCPA's commercial speech exemption applied to a defamation case arising from a dispute between Castleman, who ran an online platform between consumers and product suppliers, and Money Limited, who was hired by Castleman to fulfill customer orders. Ibid. After a dispute over payment arose, Castleman published statements about the dispute on various online social media platforms, stating that Money Limited did not fulfill its obligations and "practically stole" from Castleman. Ibid.

14

In determining whether the TCPA's commercial speech exemption applied to Castleman's speech, the Supreme Court of Texas held that the:

> TCPA does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, but only if the statement or conduct <u>arises out of</u> the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction.
>
> [<u>Id.</u> at 688 (emphasis added) (quoting Tex. Civ. Prac. & Rem. Code § 27.010(b)) (internal quotation marks omitted).]

Thus, the Court concluded that because Castleman was primarily engaged in the business of selling goods, its alleged defamatory statements did not arise from its sale of those goods or services but rather from his status as a consumer of Money Limited's services. <u>Id.</u> at 690-91.

The Texas Supreme Court explained that "[t]he mere fact that [a] defendant sells or leases goods or services does not prevent him from availing himself of the TCPA's expedited dismissal process when he speaks of other goods or services in the marketplace." <u>Id.</u> at 689. Thus, the Court held, "the statement or conduct at issue must arise out of a commercial transaction involving the kind of goods or services []defendant provides." <u>Ibid.</u> The Court explained that this interpretation "is the only reasonable and logical construction of the exemption when considered within its statutory context." <u>Id.</u> at 687. The Court also found that the "intended audience of Castleman's

15

statements was not an actual or potential buyer or customer of the goods he sells."  Id. at 691.  The Court concluded that the TCPA's commercial-speech exemption did not apply under these circumstances.  Ibid.

In Simpson Strong-Tie Co., Inc. v. Gore, the California Supreme Court "consider[ed] the scope of the commercial speech exemption" to California's 1992 anti-SLAPP statute.  230 P.3d 1117, 1120 (Cal. 2010).  Simpson Strong-Tie Company (Simpson) filed a defamation lawsuit against an attorney and his law firm (Gore) arising from an advertisement soliciting plaintiffs for a class action lawsuit involving Simpson's products.  Id. at 1120-21.  When Gore moved to dismiss Simpson's complaint under California's anti-SLAPP statute, Cal. Civ. Proc. Code §§ 424.16 to 425.18, Simpson invoked the commercial speech exemption to the statute, Section 425.17(c), which states:

> Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist:
>
> (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services.

A-0830-24

(2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue.

[Emphasis added.]

Simpson Strong-Tie Co., Inc., 230 P.3d at 1120.

The California Supreme Court noted that "[t]he point of contention [in this case] concerns whether the causes of action 'aris[e] from . . . representations of fact about [Gore's] . . . business operations, goods, or services.'"  Simpson Strong-Tie Co., Inc., 230 P.3d at 1129 (alteration in original) (citing Cal. Civ. Proc. Code § 425.17 (c)(1)).  The Court determined that Simpson's causes of action did not arise from "the representation that an attorney will investigate 'whether you have a potential claim.'"  Ibid.  The Court concluded that the alleged defamatory statements "do[] not constitute 'representations of fact about that person's . . . business operations, goods, or services'" and therefore, the statements fall outside of California's anti-SLAPP law's commercial speech exemption.  Ibid. (quoting Cal. Civ. Proc. Code § 425.17 (c)(1)).

17

The commercial speech exemption in New Jersey's UPEPA requires that (1) a person to be "primarily engaged in the business of selling or leasing goods or services," and (2) and the "cause of action arises out of a communication related to the person's sale or lease of the goods or services." N.J.S.A. 2A:53A-50c. Javerbaum does not dispute that it is engaged in the business of selling legal services. The issue before us, however, is whether the cause of action under UPEPA "arises out of a communication" related to Javerbaum's sale of services. We hold that it does not arise out of such communication.

In the present case, the judge found that although Javerbaum's website contained the word "advertisement," the post in question did not otherwise read as an advertisement related to the firm's legal services. The post did not include any information alerting readers in similar situations how to contact the firm and schedule a consultation, soliciting the firm's services or promoting the firm's handling of whistleblower lawsuits in general. Rather, the article posted in the firm's news section of the website provided commentary on a case the firm is handling and included, in part, a quotation from the attorney handling the matter stating "[t]he upcoming court proceedings will provide a platform to examine the facts and determine Holtec International Corp.'s level of responsibility and accountability." (internal quotation marks omitted).

Holtec argues that so long as the communication "relates to" the sale of goods or services, the exemption applies.

We recognize that such posts in general may increase awareness of a firm's legal services. However, in this case, Javerbaum's posting was not about the sale of its legal services nor solicitation of business for the firm. Instead, the postings were informational in nature regarding a case the firm was handling. As the motion judge aptly noted, to find otherwise would mean that any time a law firm posts on its website about a lawsuit it is handling, such posting would "relate to" the firm's legal services. This overbroad interpretation of the commercial speech exemption would result in nonsensical consequences, and we are hard pressed to conclude that such interpretation is consistent with the Legislature's intent in enacting UPEPA.

In construing the commercial speech exemption narrowly, as we must, we hold that UPEPA does not exempt all speech by sellers of goods or services—only commercial speech made in direct advertising related to the person's sale or lease of its goods or services. See Wright v. Vogt, 7 N.J. 1, 6 (1951) (explaining that exceptions in legislation are generally strictly construed). We discern no error in the judge's determination that UPEPA's commercial speech exemption did not apply under these circumstances.

IV.

A-0830-24

A.

Having determined that UPEPA applies and the commercial speech exemption does not, we turn to the final step of the UPEPA analysis—whether Holtec has pled a viable defamation claim.

> N.J.S.A. 2A:53A-55(a)(3) requires the judge to dismiss the cause of action with prejudice if either:
>
> (a) the responding party fails to establish a prima facie case as to each essential element of any cause of action in the complaint; or
>
> (b) the moving party establishes that:
>
> > (i) the responding party failed to state a cause of action upon which relief can be granted; or
> >
> > (ii) there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.
>
> [Lento, ___ N.J. Super. at ___ (slip op. at 9).]

"The law of defamation attempts to 'strike the proper balance between protecting reputation and protecting free speech.'"  Hyman v. Rosenbaum Yehiva of North Jersey, 258 N.J. 208, 236 (2024) (quoting G.D. v. Kenny, 205 N.J. 275, 292 (2011) (citations omitted)).  "The elements of a defamation claim [] are[:]  (1) 'the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.'"  Ibid. (quoting

A-0830-24

Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009) (citations omitted)).

In determining whether a cause of action for defamation exists, the court "must consider three factors: (1) content, (2) verifiability, and (3) context of the challenged statement." DeAngelis v. Hill, 180 N.J. 1, 14 (2004). The content of a statement "must be judged not by its literal meaning, but by its objective meaning to a reasonable person of ordinary intelligence." McLaughlin v. Rosanio, Bailets & Talamo, 331 N.J. Super. 303, 312 (App. Div. 2000). In evaluating the language's content, it is necessary to look at the "fair and natural meaning" of the communication through the lens of a reasonable person of "ordinary intelligence." Hyman, 258 N.J. at 237.

Further, "only verifiable statements can be defamatory." McLaughlin, 331 N.J. Super. at 312. Determining the communication's verifiability requires an analysis as to whether the communication at issue is simply a statement of opinion, which, "as a matter of constitutional law, enjoy[s] absolute immunity." Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 147 (1986). If a statement suggests "specific factual assertions that could be proven true or false," then it meets the threshold to qualify as a plausible defamatory action. Ward v. Zelikovsky, 136 N.J. 516, 531 (1994).

21

Finally, "a statement's meaning can be affected by its context." McLaughlin, 331 N.J. Super. at 312. In reviewing the context of a statement, courts consider "[t]he listener's reasonable interpretation, which will be based in part on the context in which the statement appears." DeAngelis, 180 N.J. at 15 (citations omitted).

A plaintiff must prove fault, Feggans v. Billington, 291 N.J. Super. 382, 391 (App. Div. 1996), whether negligence or actual malice. "There must be a showing of actual malice by a defendant where the statement is about a plaintiff who is a public figure or relates to an issue of public concern." Herman v. Muhammad, 480 N.J. Super. 480, 492 (App. Div. 2024). The actual malice standard is subjective and requires "the factfinder . . . [to] determine that [] defendant in fact entertained serious doubts about the truth of the statement or that defendant had a subjective awareness of . . . [its] probable falsity." Costello v. Ocean Cnty. Observer, 136 N.J. 594, 615 (1994).

"Another component of a statement's defamatory nature—and thus an element of a prima facie case—is that plaintiff must have been harmed by the alleged defamation. McLaughlin, 331 N.J. Super. at 313 (citing Ward v. Zelikovsky, 136 N.J. 516, 539-42 (1994) then citing Rocci v. Ecole Secondaire MacDonald-Cartier, 323 N.J. Super. 18, 23-24 (App. Div. 1999)). The harm

must be more than that "the plaintiff's own feelings were hurt or that he or she suffered embarrassment." Ibid. (citing Ward, 136 N.J. at 539).

Holtec alleges it asserted a viable claim of defamation, establishing the requisite elements of a prima facie case. In dismissing its complaint, Holtec contends the motion judge erred by: (1) requiring Holtec to prove actual malice because Javerbaum's speech constituted a matter of public concern; and (2) determining Holtec could not prove that the statement at issue was false.

The court concluded, however, that "what Javerbaum did," did not amount to "actionable defamation" even though it did not find Holtec's complaint "poorly pled." The court found that the communication involved a matter of public concern, thus requiring actual malice.

At issue in Javerbaum's posting was the use of the phrase "false financial statements." Holtec asserts that this phrase is a term of art commonly used in the business world and in consumer transactions; therefore, it should not be interpreted broadly. The judge disagreed and found that "calling it a 'financial statement' when maybe it should have been called a 'prospectus' doesn't transform non[-]defamation into defamation." We discern no error in the court's finding.

An ordinary person reading Javerbaum's article is likely to understand the term "financial statements" to mean a statement pertaining to the

23

company's finances. The "gist" of the statement in the posting, as the judge noted, referred to a document containing financial information that was going to be relied upon by others.

Holtec's complaint against Javerbaum alleges that the article posted on its website contained the following defamatory statements:

> a. Statements referencing Holtec's 'financial statements,' being 'make believe,' an allegation that is not contained in the O'Rourke [c]omplaint[;]
>
> b. Statements saying that O'Rourke was terminated for resisting submitting 'false financial statements,' an allegation that is not contained in the O'Rourke [c]omplaint[;]
>
> c. Statements linking to an Asbury Park Press article that contained similar defamatory statements that has since been retracted and revised, without changing the link to the revised or retracted article.

O'Rourke's CEPA complaint set forth various allegations regarding the financial projections in the prospectus intended to be sent to potential investors, for example:

> [T]he document included numerous false and misleading statements, and legally the document could not contain 'make believe' or unsupported financial projections.
>
> . . . .
>
> [O'Rourke] would not participate in compiling rushed financial projections due to the likelihood of material errors, and he would not present the [p]rospectus to

24

A-0830-24

[the investor] if it included what he believed to be materially false or fraudulent data or information.

. . . .

[O'Rourke] believed submitting the [p]rospectus as currently drafted . . . could violate the law . . . .

. . . .

[O'Rourke] sent an email . . . wherein he stated he believed numerous statements in the [p]rospectus were false and misleading and that there was a high likelihood the financial projections included in the [p]rospectus were materially inaccurate.

We are satisfied that Javerbaum's reporting of the information in O'Rourke's CEPA complaint fairly and accurately summarizes the gist of the complaint and does not mislead the reader as to the heart of O'Rourke's wrongful termination allegations.

Javerbaum also asserts that the statement is eligible for protection of the fair-report privilege. The privilege applies to "the publication of defamatory matter concerning another in a report of an official action" and "attaches where the report is accurate and complete or a fair abridgement of the occurrence that is recounted." Salzano v. North Jersey Media Group Inc., 201 N.J. 500, 505-06 (2010). The Supreme Court extended the fair-report privilege to "defamatory statements contained in filed pleadings that have not yet come before a judicial officer." Id. at 519.

As the Supreme Court in <u>Salzano v. North Jersey Media Group Inc.</u> explained, for the privilege to apply to the reporting of the contents of a complaint, the published information must be "full, fair, and accurate." <u>Id.</u> at 522 (quoting <u>Costello</u>, 136 N.J. at 607 (citations omitted)). "Fairness requires that although the report need not be exhaustive, 'it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it . . . .'" <u>Id.</u> at 523 (quoting <u>Costello</u>, 136 N.J. at 608 (quoting <u>Restatement (Second) of Torts</u> § 611 comment f (1976))). Even if "a finer point" could have been put on a statement, it will not be considered misleading provided it is "substantially correct." <u>Id.</u> at 526.

Although O'Rourke's complaint did not use the phrase "false financial statements," Javerbaum's posting of the article reporting on the case is a full and fair summary of the gist of the allegations that form the basis of O'Rourke's CEPA complaint. As in <u>Salzano</u>, the report and headline at issue did not include the exact wording of the complaint. 201 N.J. at 525. As we held, "although the publication is not a verbatim regurgitation of the complaint, it does not need to be. It is substantially correct and that is all that is required." <u>Id.</u> at 526. Because we are satisfied that Javerbaum's posting was a full, fair, and accurate account of the O'Rourke CEPA complaint, we agree that the protections of the fair-report privilege apply.

## B.

Even though we conclude that Javerbaum's statements are shielded by the fair report privilege, for the sake of completeness, we briefly address Holtec's contention that the motion judge erred in requiring it to establish actual malice because Javerbaum's statements constituted a matter of public concern. Because we have determined that Javerbaum's statements involved a matter of public concern, Holtec was required to prove actual malice. Neuwirth v. State, 476 N.J. Super. 377, 391 (App. Div. 2023) (citing Senna, 196 N.J. at 498).

"[F]alse statements about . . . matters of public concern are not actionable unless they were made with actual malice." Ibid. "To satisfy the actual-malice standard, a plaintiff must show by clear and convincing evidence that the publisher either knew that the statement was false or published with reckless disregard for the truth." Ibid. (quoting Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 165 (1999)). Bare allegations of actual malice in a complaint are insufficient to show a "'defendant's state of mind' and whether [] 'defendant in fact entertained serious doubts about the truth of the statement or . . . had a subjective awareness of the story's probable falsity.'" Id. at 392 (quoting Costello, 136 N.J. at 615).

A-0830-24

Holtec's complaint asserts that Javerbaum's conduct was done with actual malice. It alleges that Javerbaum was "well aware that false statements made about Holtec's 'financial statements' will harm Holtec's business." Holtec also alleges that by maintaining the link to the Asbury Park Press "false article" on its website for over eleven months after the Asbury Park Press retracted its article, "shows that Javerbaum has disregarded the truth." These assertions, without more, are inadequate to establish a prima facie case of actual malice.

The motion judge noted that Holtec argued that actual malice can be inferred based on Javerbaum's failure to remove the posting after it was pointed out to them and after the Asbury Park Press issued a retraction and modification in its article. Moreover, Javerbaum left the link to the initial Asbury Park Press article on its website instead of posting the updated article. In the present case, there is no support for a claim of actual malice, which occurs where "the publisher fabricates a story, publishes one that is wholly unbelievable, or relies on an informant of dubious veracity . . . or purposely avoids the truth." Neuwirth, 476 N.J. Super. at 392 (quoting Lynch, 161 N.J. at 165-66) (internal citations omitted).

In examining the "content, form, and context of the speech" at issue in this case—Javerbaum's article about the O'Rourke case and the link to the

28

Asbury Park Press article about the case—the content relays information about a pending CEPA lawsuit against a major nuclear reactor company; and the context involves the identity of the speaker—the law firm representing plaintiff in the case who has an ethical duty to "exercise due care" and diligence in the filing of a lawsuit.[3]  See Senna, 196 N.J. at 496-97.  Finally, the identity of the target audience is the general public as the article was posted on the law firm's news website.  See Lento, ___ N.J. Super. at ___ (slip op. at 20-21).  Under these circumstances, Holtec's proofs fall short of the "high standard" of actual malice.  Neuwirth, 476 N.J. Super. at 391.

In sum, we hold that UPEPA applies to Javerbaum's posting regarding a matter of public concern and that UPEPA's commercial speech exemption does not exclude the posting from protection.  The judge correctly determined that Holtec did not establish a prima facie case of defamation, particularly because it could not meet the "high standard" of actual malice.  Ibid.  Accordingly, we agree with the motion judge that Holtec's complaint should be dismissed with prejudice under UPEPA for failing to establish a prima facie case as to each essential element of defamation.

---

[3]  RPC 3.1 prohibits a lawyer from "bring[ing] or defend[ing] a proceeding, nor assert[ing] or controvert[ing] an issue therein unless the lawyer knows or reasonably believes that there is a basis in law and fact for doing so that is not frivolous."

A-0830-24

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0830-24